## Staunton.

WATTS v. COMMONWEALTH

SEPTEMBER 12, 1901.

1. CRIMINAL LAW—*Appeal from Justice—Reversal—Former Jeopardy.*—A reversal, at the instance of the prisoner, of the judgment of a justice of the peace, for formal defects in the charge of a misdemeanor, is no bar to further prosecution for the same offence.
2. CRIMINAL LAW—*Indictment—Record of Finding.*—An order of a corporation court, entered of record, "that the indictment presented by the grand jury against N. C. Watts for misdemeanor be certified to the police justice of this city, to be by him disposed of according to law," is a sufficient record of the finding of such an indictment.
3. CRIMINAL LAW—*Indictment—Errors not Apparent.*—Objections to an indictment for errors which do not appear on the face of the indictment, can only be taken advantage of by a motion to quash, or by plea,—not by demurrer.
4. CRIMINAL LAW — *Jailor — Negligent Escape — Sheriff—Deputy.*—The sheriff in Virginia is *ex officio* jailer of his county, but may devolve the duties of jailer on a deputy, and will not be criminally liable for a negligent escape permitted by him. If, however, a prisoner is permitted to go at large with the knowledge and approval of the sheriff, and by his direction and authority, and while so at large the prisoner escapes, the sheriff is himself criminally liable for the escape.
5. CRIMINAL LAW—*Misdemeanors—Accessories.*—At common law there are no accessories to misdemeanors. All concerned are principals.

Error to a judgment of the Hustings Court for the city of Staunton, rendered February 14, 1901, on a prosecution of the plaintiff in error for a misdemeanor.

*Affirmed.*

The opinion states the case.

*Patrick & Gordon* and *Curry & Glenn,* for the plaintiff in error.

*Attorney-General A. J. Montague* and *Carter Braxton,* for the Commonwealth.

KEITH, P., delivered the opinion of the court.

N. C. Watts, plaintiff in error, who was, on the 15th day of June, 1900, sheriff of the county of Augusta, and as such, by virtue of section 934 of the Code, keeper of the jail of said county, was on February 19, 1901, indicted for negligently suffering D. H. Taylor, a prisoner lawfully committed to his custody, to escape. A copy of this indictment was, in accordance with section 4106 of the Code, as amended by an act of 1897-'8 (Acts 1897-'8, p. 289), certified to the Police Justice of Staunton, before whom Watts was tried, convicted and fined $50. From this judgment he appealed to the Hustings Court, assigning numerous errors, among others, that the indictment was not endorsed "a true bill," and the Hustings Court, overruling all other objections to the indictment, but being of opinion that it was necessary to its validity that it should be so endorsed, set aside the judgment of the justice, and directed the clerk to forthwith certify a true copy as found by the grand jury, which was done. The copy thus certified contains the endorsement "a true bill. Ernest Nothnagle, foreman."

It is unnecessary for us to express an opinion upon the propriety of setting aside the judgment for this cause, but we may at this point dispose of one contention of the plaintiff in error, which is, that the judgment of the justice from which he appealed, and which was set aside upon his assignment of a purely formal error in the proceedings, entitled him to an acquittal. That was not a trial upon the merits, and it was set aside at his instance. It is hardly necessary to cite authority to show that these facts constitute no bar to a further prosecution.

Watts was again tried upon this indictment, and a judgment rendered against him, imposing a fine of $50, from which judgment he appealed to the Hustings Court, where he was tried before a jury, found guilty of a misdemeanor, and a fine imposed against him of $50, upon which the court entered judgment.

The case is now before us upon errors assigned to the rulings of the Hustings Court.

It is contended by plaintiff in error that he was convicted without a warrant, and without indictment against him.

It is urged that the indictment under section 4106 takes the place of a warrant, and constitutes the authority upon which the justice proceeds, and it is contended that it does not appear from the record that the grand jury ever found an indictment in this case, and the judgment of the General Court in *Cawood's Case*, 2 Va. Cases, 527, is relied upon to establish that proposition.

It was there held that "when a bill of indictment is found by the grand jury and endorsed 'a true bill' by the foreman, it should be brought into court, presented by the grand jury, and then the finding should be recorded;" that "an omission to record the finding cannot be supplied by a paper purporting to be an indictment, with an endorsement 'a true bill,' signed by the person who was the foreman of the grand jury at that term. Nor can it be supplied by the recital in the record that he stands indicted, nor by his arraignment, nor by his plea of not guilty. It cannot be intended that he was indicted. It must be shown by the record of the finding. The recording of the finding of the grand jury is as essential as the recording of the verdict of the jury."

To these propositions we have nothing to object, but the case before us is easily distinguished from that upon which counsel relies. It appears from this record that the following entry was made upon the records of the Hustings Court: "September 6, 1900. Ordered that the indictment presented by the grand jury against N. C. Watts for misdemeanor be certified to the

Police Justice of this city, to be by him disposed of according to law. A copy—teste: Newton Argenbright, clerk."

There is a case almost identical with the one under consideration, also reported in 2 Va. Cases, at page 160, *Myers* v. *Commonwealth*, where the defendant was presented for unlawful gaming, the entry on the minute book being as follows:

" Ordered that Joshua Myers, who was this day presented by the grand jury, be summoned to appear here at May court next to answer the said presentment."

On the trial the defendant pleaded that there was no record of the supposed presentment which he was summoned to answer, remaining in said court; but the court held that there was such record, and judgment was rendered for the fine. the court being of opinion that the minute book of the clerk obviously referred to the written presentment made by the grand jury, which presentment itself was a part of the records of the court.

This case seems to be directly in point, and is conclusive of the first assignment of error.

It is assigned as error that the indictment is demurrable. We are of opinion that this indictment sufficiently recites the indictment, trial and conviction of D. H. Taylor; that he was in the proper legal custody of plaintiff in error at the time of his escape, and that the escape was the result of the negligence of plaintiff in error. There is nothing in the record from which it can be inferred that the indictment was amended by the Hustings Court, or the clerk thereof. It does appear that as originally certified to the Police Justice it was an incomplete copy, in that it omitted an endorsement which, in the judgment of the Hustings Court, was necessary to its validity as an indictment, but that endorsement was not interpolated by authority of the Hustings Court, or its clerk, but the clerk, upon the order of the court, prepared and certified a true copy, in which the omitted endorsement appeared.

The objections to which we have alluded are all stated as

grounds of demurrer. It is obvious that the greater part of them could not with propriety be considered upon demurrer, but could be presented only by a motion to quash, or a proper plea. The indictment was, we think, sufficient, and the demurrer properly overruled.

It is also assigned as error that the Hustings Court did not set aside the verdict of the jury as contrary to the law and the evidence, and here the objection is reiterated that there was no indictment or warrant upon which to found the case, and no charge of any offence. This we have already sufficiently considered. Secondly, that it does not appear from the evidence that Taylor was in the lawful custody of appellant at the time he escaped; and, third, that if Taylor was in the lawful custody of the deputy sheriff, plaintiff in error is not liable.

It is charged in the indictment, and shown by the evidence, that D. H. Taylor was tried at the July term of the County Court of Augusta county, in the year 1899, for breaking into an out-house in the night time, and stealing two turkeys and five chickens; that for this offence he was found guilty by the jury, and sentenced to confinement in the county jail for twelve months from the 29th day of July, 1899, and to pay a fine of $100; that on the 15th of June, 1900, while the said judgment still remained in full force, he escaped and is still at large. During all this period, plaintiff in error was sheriff of Augusta county, and, as such, by virtue of section 934 of the Code, the keeper of its jail. It is true that sheriffs are authorized by section 817 to appoint deputies in the manner therein prescribed, who are authorized to discharge any of the official duties of the principal during the continuance of his office, unless it be some duty the performance of which by a deputy is expressly prohibited by law. There is no doubt that the duty imposed upon the sheriff to be the keeper of the jail may be performed by his deputy, and in fact is, as a rule, entrusted to him. It remains, however, that the sheriff is the keeper of the jail, and the legal

custodian of those who are lawfully confined in it. It is true .
that he is not criminally responsible for the acts of his deputy
or agent. As was said by the General Court in *Commonwealth*
v. *Lewis*, 4 Leigh 666: " This is, in fact, a criminal proceeding
against a high sheriff for the negligence or misfeasance of his
deputy;" and the court very properly held that the sheriff was
not criminally liable for such negligence or misfeasance, and
directed an acquittal.

In this case, Watts is not charged with any offence committed
by his deputy, but that he "unlawfully did negligently suffer
him, the said D. H. Taylor, to escape from his, said N. C. Watts'
custody, and to go at large, against the peace and dignity of
the Commonwealth of Virginia." The charge against him is of
his own personal negligence, and not the imputed negligence of
his deputy or agent.

It appears from the instructions given by the Hustings Court
that it fully recognized the principle announced in *Common-
wealth* v. *Lewis, supra.* The first instruction given is, "that the
sheriff, as such, is, by virtue of his office, jailer, but with power
to appoint a deputy to discharge the duties thus devolved on
him, and he is not criminally liable for the acts of such deputy,
unless he actually concurred in and directed them, in which
case he must be regarded as having recalled the authority there-
tofore given by him to his deputy, and to have committed the
act himself."

It appears from the evidence of Thomas A. Dawson, doubt-
less an honest, but certainly not an unfriendly witness, that he
was the deputy sheriff of Augusta county, duly appointed by
Watts, the sheriff, and as such he was in charge of the jail; that
in July, 1899, Taylor was committed to his custody and received
into the jail, and that he escaped on the 12th day of June, 1900,
his term of imprisonment not having at that time expired. In
answer to the question as to how he got away, Dawson replied:
"We had him working around the jail there, and about 7 o'clock

·on that day, after I finished supper, I went to look him up and found that ·he was gone." Q. "He was then outside the jail?" A. " Yes, sir; ʼhe was not locked up. When I went to supper, I left him in the lower part of the jail, but he was not locked ·up." Q. "Was this the first time that he had been turned out?" A. " No, sir; we had him working around the jail there for some time."

It appears that the liberty allowed the prisoner was not only notorious in the community, but was offensive to certain citizens, .and that complaint was made. It seems that the deputy talked with Watts and with the county judge upon the subject, and that the judge said to him that "he saw no impropriety in letting him out in the day-time, and locking him up in the night-time. After this I talked with Watts, and he told me the same thing that the judge did. Mr. Watts told me that he talked with the judge, and that Judge Chalkley told him the same thing he told me."

Judge Chalkley, recalling the conversation which he had with. Watts, said: " I saw Watts, and had a talk with him, and told him that certain citizens had come to me with the complaint ʼthat Taylor was allowed to go about the streets, and in the ·county, and that the sight of him in the county had incensed these people. This complaint was made to me about six weeks ·or two months ʼbefore I saw Mr. Watts. I had nothing to do with it except as ʼgo between.' I saw Watts and told him the ·complaint, and suggested to him and advised that this man be kept out of sight of the public. I do not remember if I advised Mr. Watts that he should be locked up in jail, but that he should be kept ·out of sight of the public. I think we had a conversation about letting this man work about the jail, and I gave my consent to that. Watts represented to me that he was a very valuable man, and I advised Mr. Watts to keep the man out of ─the sight of the public."

Watts was put upon the stand, and his evidence differs in no

material respect from that of Judge Chalkley and Dawson. His account of the interview between the judge and himself is as follows:

"I went to Newport News that night—that was on the 28th of May—and when I came back the judge came down to my office and knocked on the window and asked me to come to his office, and I went up there, and he told me about the complaint that was being made about this man going out in the county, and that he was running at large. I told him that I had the man out working, and that he (the judge) gave his authority, and I said that I thought it ought to be looked up. The judge said for me to keep him down below, and not let him out on the street."

It appears from this testimony that Watts not only had full knowledge that the prisoner was being suffered to go at large, but that it was done with his full approbation, by his authority, and under his direction. His statement in the quotation from his evidence just made in which he gives an account of the interview between himself and the judge of the County Court, in which he uses this language: "*I* told him that *I* had the man working, and that the judge gave his authority, and *I* said that *I* thought it ought to be looked up," is sufficient to warrant. the jury in finding not only knowledge and acquiescence, but the active participation in the offence charged, sufficient of itself to sustain the verdict of the jury.

That the offence was committed, there is no doubt; that a prisoner in lawful custody was by the official charged with his care negligently suffered to escape, cannot be questioned. If Watts be not responsible, then the offence must go unpunished, for it would be a harsh judgment which would acquit the principal and punish the deputy who had acted within the line of duty approved by, and indeed, prescribed to him by his superior officer.

It is suggested that the facts could not do more than make

Watts an accessory before the fact; but "at common law, in misdemeanors, there are no accessories, all concerned being principals." 1 Wharton's Criminal Law, sec. 223. But we do not rest our judgment upon that doctrine. Watts was indicted for his own dereliction in the performance of his duty; the jury, upon proper instruction, found him guilty, and the evidence, in our opinion, sustains their verdict.

The judgment must be affirmed.

*Affirmed.*