Justin C. WESTMORELAND, Plaintiff,

v.

Wendell H. BROWN, et al., Defendants.

Civ. A. No. 3:94cv455.

United States District Court,
E.D. Virginia,
Richmond Division.

March 21, 1995.

Thomas W. Williamson, Jr., Williamson & Stoneburner, Richmond, VA, Steven D. Benjamin, Nancy L. Quinn, Steven D. Benjamin & Associates, Richmond, VA, for plaintiff.

Frederick R. Kozak, Maloney, Yeatts & Barr, Richmond, VA, for Wendell H. Brown.

William J. Hoppe, City of Richmond, Sr. Asst. City Atty., Richmond, VA, for City of Richmond.

John A. Gibney, Jr., Shuford, Rubin & Gibney, P.C., Richmond, VA, for Andrew J. Winston.

## MEMORANDUM OPINION

PAYNE, District Judge.

Pursuant to 42 U.S.C. §§ 1983 and 1988, Justin C. Westmoreland instituted this action against the City of Richmond, the members of the City Council, the City Manager, and Sheriff Andrew J. Winston in their individual and official capacities. Westmoreland filed the action in the Circuit Court of the City of Richmond. The defendants timely removed it to this court.

The City has moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief can be granted. Winston filed a demurrer in state court before removal. All parties agree that Winston's motion should be treated as a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The parties agreed at the hearing on those motions that the claims against the members of the City Council and the City Manager should be dismissed, leaving only the City, Winston, and Brown as defendants.[1]

## STATEMENT OF FACTS

In October 1992, Westmoreland was detained in the Richmond City Jail, awaiting trial on charges of breaking and entering and grand larceny. On October 19, 1992, Wendell H. Brown, a deputy sheriff and a guard at the jail, asked an inmate, Bobby L. Seward, to arrange to have Westmoreland physically attacked. The pleadings do not

---

1. Westmoreland's complaint does not assert that the members of the City Council and the City Manager directly participated in the assault which is the subject of this action. Instead, he contends that they were deliberately indifferent to the pervasive risk of harm created by overcrowding and understaffing at the Richmond City Jail. Because Westmoreland has sued the City on the same theory, it is unnecessary to have the City Council and City Manager as additional defendants.

disclose what motivated Deputy Brown's deplorable conduct; however, at oral argument, counsel indicated that Brown had instigated the attack because Westmoreland had burglarized Brown's house. In response to Brown's request, Seward arranged to have two other inmates, Charles F. Crawley and Orell L. Logan, assault Westmoreland. Thus, on October 20, and according to plan, Jerald T. Miller, another inmate, lured Westmoreland from his cell to the rear of the cell block where Crawley and Logan beat him. Following the assault, another inmate assisted Westmoreland to his cell. Shortly thereafter, Logan assaulted Westmoreland for a second time.[2]

Following Westmoreland's voluntary dismissal of Counts IV and V against the members of the City Council and the City Manager, there remain five counts. Count I is comprised mostly of background factual allegations and then appears to assert a claim against Deputy Brown on the theory that his intentional misconduct, which was executed under color of law, constituted punishment before adjudication of guilt in violation of Westmoreland's Fourteenth Amendment rights. Count II is a state law assault and battery claim advanced against Brown. Count III is a claim against the City premised on the assertion that the City has a policy and custom of deliberate indifference toward the pervasive risk of physical harm caused by overcrowding and understaffing at the City Jail and that this policy caused the assault against Westmoreland. Count VI alleges a claim against Winston that is essentially the same as Count III against the City, except that it charges the Sheriff personally with deliberate indifference.[3] Count VII alleges that state law makes Winston strictly liable for Brown's intentional misconduct, and that this strict liability doctrine makes Winston liable both for the violation of Westmoreland's Fourteenth Amendment rights and for the assault and battery.

## DISCUSSION

■ On a motion to dismiss under Fed. R.Civ.P. 12(b)(6), the allegations of the complaint are to be liberally construed and the motion should be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court presumes all factual allegations in the complaint to be true and accords all reasonable inferences to the non-moving party. 2A Moore's Federal Practice ¶ 12.07[2.5] (2d ed. 1994). However, the court is not bound to accept as true "conclusory allegations regarding the legal effect of the facts alleged." *Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995). Were this not the case, "Rule 12(b)(6) would serve no function, for its purpose is to provide a defendant with a mechanism for testing the legal sufficiency of the complaint." *District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1085–86 (4th Cir.1979).

## A. Fourteenth Amendment Protection of Pretrial Detainees From Prison Violence

■ In Counts III and VI, Westmoreland contends that the City and Sheriff Winston, respectively, are liable under Section 1983 for the injuries suffered in the October 20 assault. Section 1983 imposes civil liability on any person acting under color of law to deprive another person of the rights and privileges secured by the Constitution and laws of the United States. 42 U.S.C. 1983.

2. The timing of these events is ambiguous in one respect. According to the complaint, Brown arranged the assault "on or about" October 19, and it was committed "on or about" October 20. It appears from the briefs, however, that the assault was completed by approximately 1:46 a.m. on October 20, 1992, at which time a deputy assisted Westmoreland. Thus, the attack initiated by Brown may have taken place within a few hours after Brown asked Seward to arrange it.

3. Westmoreland contends that both the City and Winston may be held liable for the assault because both bear responsibility for the City Jail. Westmoreland points to the City's responsibility for building and maintaining jails, Va.Code § 53.1–71, and to the Sheriff's responsibility for day to day operation of the jail. *See* Va.Code 53.1–119; *Watts v. Commonwealth,* 99 Va. 872, 39 S.E. 706, 707 (1901) (sheriff is "keeper of the local jail"). The disposition of the claims against the City and the Sheriff made in this opinion on other grounds make it unnecessary to address this issue.

Section 1983, of course, "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver,* —— U.S. ——, ——, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994), citing *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3, 61 L.Ed.2d 433 (1979). Therefore, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright,* —— U.S. at —— ——, 114 S.Ct. at 811.

At the time of the assault Westmoreland was a pretrial detainee at the Richmond City Jail. Therefore, the constitutional protection at issue in this case is the right, guaranteed by the Fourteenth Amendment, not to be punished before an adjudication of guilt in accordance with due process of law. *Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979); *City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Gray v. Farley,* 13 F.3d 142, 146 (4th Cir.1993); *Cooper v. Dyke,* 814 F.2d 941, 948 (4th Cir.1987).

■ Westmoreland seems to view the issue in this case as one of punishment in violation of the Fourteenth Amendment. In two counts alleging Section 1983 liability on the part of the City and Sheriff Winston, the complaint asserts:

[A]s a direct and proximate result of the above described deliberate indifference ... Mr. Westmoreland was *punished without having been convicted* of a crime and *was therefore deprived* of his rights, privileges and immunities as secured by the Fourteenth Amendment to the Constitution of the United States of America.

(Motion for Judgment, ¶¶ 49, 85) (emphasis added). Westmoreland provides no authority for his misplaced and rather casual reference to the Privileges and Immunities Clause, nor is the court aware of any such authority. Because the authorities discussed herein hold that a pretrial detainee's rights are protected by the Due Process Clause, the court treats Westmoreland's Fourteenth Amendment Claim as having been brought pursuant to that clause of Section 1 of that amendment.

In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court of the United States addressed the constitutional protection that the Due Process Clause in the Fifth Amendment affords federal pretrial detainees:

In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to *punishment of the detainee.* For *under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.* [Citations omitted]. A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.' [Citations omitted]. And, if he is detained for a suspected violation of a federal law, he also has had a bail hearing. [Citations omitted]. Under such circumstances the *Government concededly may detain him to insure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the constitution.*

*Bell,* 441 U.S. at 535–36, 99 S.Ct. at 1872–73 (emphasis added); *City of Revere,* 463 U.S. at 244, 103 S.Ct. at 2983.[4]

■ In *Bell,* the Supreme Court observed that "[d]ue process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."

4. In *Bell,* the correctional facility was a federal one and hence the Due Process Clause of the Fifth Amendment was at issue. Where, as here, the infringement is alleged to have occurred at the hands of a state, the Due Process Clause of the Fourteenth Amendment is the relevant constitutional provision. *City of Revere,* 463 U.S. at 244, 103 S.Ct. at 2983; *Cooper v. Dyke,* 814 F.2d 941, 948 (4th Cir.1987).

*Bell,* 441 U.S. at 535, n. 16, 99 S.Ct. at 1872, n. 16.

■ · The dimensions of a pretrial detainee's Due Process rights have not been definitely determined by the Supreme Court or the Fourth Circuit. Indeed, both have expressly declined to resolve the issue. *City of Revere v. Massachusetts General Hosp.,* 463 U.S. at 244, 103 S.Ct. at 2983; *Loe v. Armistead,* 582 F.2d 1291 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980).[5] However, because both the Fourteenth Amendment's Due Process clause and the Eighth Amendment address the permissibility of punishment, decisions speaking to the dimensions of the Eighth Amendment's prohibition of cruel and unusual punishment provide guidance in two respects. First, the due process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hosp.,* 463 U.S. at 244, 103 S.Ct. at 2983; *see also Swofford v. Mandrell,* 969 F.2d 547, 549 (7th Cir.1992); *Loe,* 582 F.2d at 1294. Second, and more important to today's case, Eighth Amendment jurisprudence has addressed the contours of the term "punishment" which lies at the core of the protection of inmates afforded by both the Eighth and Fourteenth Amendments.

■ The most recent and complete statement of the Eighth Amendment standard for assessing cruel and unusual punishment is in *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), where the Supreme Court, in defining the "deliberate indifference" standard, held that:

a prison official cannot be found· liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless *the official knows of and disregards an excessive risk to inmate health and safety;* the official must both be aware of facts from which the inference could be drawn that a *substantial risk of serious harm exists,* and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; *it outlaws cruel and unusual "punishments."* An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. [Citations omitted]. But an *official's failure to alleviate a significant risk that he should have perceived but did not,* while no cause for commendation, *cannot under our cases be condemned as the infliction of punishment.*

*Id.* at ——, 114 S.Ct. at 1979 (emphasis added). *Farmer* thus teaches that punishment, whether for a convicted inmate or a pretrial detainee, is the product of intentional action, or intentional inaction, respecting known and *substantial* risks of harm.[6]

The United States Court of Appeals for the Fourth Circuit has applied Eighth Amendment principles in the Fourteenth Amendment context where the provision of medical care to pretrial detainees is at issue. For example, in *Belcher v.· Oliver,* 898 F.2d 32 (4th Cir.1990), the Fourth Circuit held

---

5. In *Cooper v. Dyke,* 814 F.2d 941 (4th Cir.1987), the Fourth Circuit expounded on the protection extended by the Due Process clause to an individual who had not yet been arrested; and who, therefore, had not been convicted and, in fact, had not even had the benefit of a judicial determination of probable cause. The Court of Appeals held: "[i]n these circumstances, where no process was invoked, even deprivations of liberty that do not rise to the level of 'punishment' arguably suffice to establish a Fourteenth Amendment violation." *Id.* at 949. In *Cooper,* the Fourth Circuit expressly distinguished the situation before it from the situation in *Bell*

where, as here, there has been a judicial determination of probable cause. *Id.* Therefore, *Cooper* is not informative of the parameters of Due Process protection in this case.

6. When referring to the extent of risk of which an official must be aware to be held "deliberately indifferent," the Court appears to use the terms "substantial risk," "significant risk" and even "excessive risk" interchangeably. This court will refer to the *Farmer* standard as one of "substantial risk," while noting that it sees no appreciable difference between the terms.

that "[t]he Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." In *Mitchell v. Aluisi*, 872 F.2d 577 (4th Cir.1989), the Court of Appeals considered a Fourteenth Amendment claim by a pretrial detainee who had alleged denial of adequate medical care. In assessing that claim, the Fourth Circuit observed:

> Because Mitchell was a pretrial detainee and not a convicted prisoner at the time of the alleged denial of medication, her claim is governed by the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's prohibition against cruel and unusual punishment, which operates only after the state has secured a conviction. [Citations omitted]. A violation of the Eighth Amendment standard set forth in *Estelle* [*v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ] may be used, however, to determine a due process violation. *Whisenant v. Yuam*, 739 F.2d 160, 163 n. 4 (4th Cir. 1984).

*Id.* at 581. The footnote from *Whisenant* that is cited in *Mitchell v. Aluisi* is instructive because there the Fourth Circuit commented that:

> *Estelle v. Gamble* prescribed the standard applicable to prisoners under sentence of confinement to whom the eighth amendment applies. Whisenant was a pretrial detainee at the time of the events about which he complains. But, *Loe v. Armistead*, 582 F.2d 1291 (4th Cir.1978) holds that the 'deliberate indifference' standard is applicable to pretrial detainees under the Fourteenth Amendment.

*Whisenant v. Yuam*, 739 F.2d 160, 163 n. 4 (4th Cir.1984).

■ These decisions explicate the logical, and legally permissible, conclusion that Eighth Amendment holdings respecting punishment of convicted inmates are, to some extent, applicable to define the protections afforded by the Fourteenth Amendment to pretrial detainees.[7] They, however, do not, define precisely the extent of that application.

Resolution of this issue depends, of necessity, on the scope of a particular decision applying the Eighth Amendment, and, of course, a decision respecting the Eighth Amendment may proceed on one of several theories. First, it might address what constitutes "punishment" in the constitutional sense. A decision of that nature is particularly instructive in a Fourteenth Amendment case where the issue is whether any punishment has been imposed. Second, an Eighth Amendment decision might bypass the general discussion of "punishment" and conclude that the challenged conduct is "cruel and unusual punishment" within the meaning of the Eighth Amendment. A decision such as that instructs that the same conduct, if directed at a pretrial detainee, would also violate the Fourteenth Amendment because "[c]ruel and unusual punishment" of course, is "punishment." *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1985) (Fourteenth Amendment protection at least as great as Eighth Amendment protection). Third, an Eighth Amendment decision might hold only that the challenged conduct is not "cruel and unusual punishment." A decision of that ilk is not directly portable to a Fourteenth Amendment case because it leaves unresolved whether the challenged conduct is punishment that is not cruel and unusual or is not punishment at all.

■ Against that background, it appears that the Supreme Court's recent decision in *Farmer v. Brennan*, — U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) provides dispositive guidance to resolution of the issues raised by Westmoreland's complaint. In *Farmer*, the Court addressed what constitutes punishment, holding that while an offi-

---

7. Westmoreland recognizes this application because he relies on cases applying the Eighth Amendment's protection from cruel and unusual punishment to instances of inmate on inmate violence when defending his Fourteenth Amendment claim. (Plaintiff's Mem. in Opposition to City's Motion to Dismiss, pp. 6–7), citing *Farmer v. Brennan*, — U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Woodhous v. Commonwealth of Virginia*, 487 F.2d 889 (4th Cir.1973); *Morgan v. District of Columbia*, 824 F.2d 1049 (D.C.Cir.1987).

cial's "act or omission unaccompanied by *knowledge of a significant risk of harm* might well be something society wishes to discourage ... [it] cannot under our cases be condemned as the infliction of punishment." *Farmer,* ⎯⎯ U.S. at ⎯⎯, 114 S.Ct. at 1979 (emphasis added). *Farmer* thus tells us that the official whose conduct is challenged actually must know of a substantial risk of harm and, implicitly, that a substantial risk of harm must exist in fact before there can be a constitutionally protected deprivation based upon the "deliberate indifference" of that official.

The Supreme Court then addressed when an official's conduct constitutes cruel and unusual punishment under the Eighth Amendment, holding that he must be "both aware of facts from which the inference could be drawn that a *substantial risk of serious harm* exists, and he must also draw the inference." *Id.* (emphasis added). So informed, we now turn to whether Westmoreland has alleged a sufficiently "substantial" risk of harm to state a claim within the meaning of the Fourteenth Amendment.

### 1. Substantial Risk of Harm

■■■■ Any time an individual is incarcerated, there is some risk that he may be a victim of violence at the hands of fellow inmates, whether he is convicted or awaiting trial. It is not possible to eliminate the risk of assault in jails for pretrial detainees or convicted felons, any more than it is to eliminate that risk in society at large. Of course, it is constitutionally permissible to detain persons in jail before trial. *See United States v. Salerno,* 481 U.S. 739, 755, 107 S.Ct. 2095, 2105, 95 L.Ed.2d 697 (1987). Hence, it is not unconstitutional *per se* to subject a pretrial detainee to the basic risks of harm inherent in any incarceration.[8] The issue of constitutional import presented in this action is when the risk of harm becomes so substantial that "deliberate indifference" to it, within the meaning of *Farmer v. Brennan,* is the legal equivalent of inflicting "punishment."

■■■■ The decisions finding that prison assaults constitute unconstitutional "punishment" have most often done so upon finding one of three species of particularized harm. In the first, the plaintiff has been at some particularized risk individually because of: (i) a personal trait; or (ii) membership in an identifiable class that is particularly vulnerable to harm. *See Farmer v. Brennan,* ⎯⎯ U.S. ⎯⎯, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (placement of frail transsexual in a particular facility may deprive him of Eighth Amendment rights if defendants deliberately disregarded his particular vulnerability to sexual assault). In the second, the person who committed the assault has demonstrated an unusually violent nature of which the defendant knows and which makes the assailant a substantial risk to his fellow inmates. *See Morgan v. District of Columbia,* 824 F.2d 1049 (D.C.Cir.1987) (official liability exists where assailant who had been convicted of first degree murder, had assaulted fellow inmates in the past, had plotted to kill a fellow inmate, and had undergone psychiatric treatment was not segregated into a higher security facility). In the third, the defendants were aware that the specific assault was ongoing or had occurred, yet had failed to respond to protect, or to treat, the victim. *See Swofford v. Mandrell,* 969 F.2d 547 (7th Cir.1992) (motion to dismiss Section 1983 claim denied where plaintiff was beaten, kicked, urinated on, and sodomized with a broom handle, and where sheriff and deputies neither answered his repeated screams for help nor inspected his cell for eight hours after the assault).

Although it is in situations such as those described above that courts most often have determined that prison violence gives rise to a constitutional deprivation, *Farmer* makes clear that an inmate need not allege a risk of harm particular to him at the hands of a known assailant. In that regard, the Court held:

> Nor may a prison official escape liability for deliberate indifference by showing that,

---

8. The complaint does not assert that pretrial detainees are entitled to be free from all risk of assault from fellow inmates. Nor does it advance the theory that pretrial detainees and con-

victed inmates present a constitutionally different risk group, the co-mingling of which raises a breach of constitutional protection.

while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health,' [citation omitted], and it does not matter whether the risk comes from a single source or multiple sources, *any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.*

*Farmer,* —— U.S. at ——, 114 S.Ct. at 1982 (emphasis added).

■ The Court then posited two circumstances where a risk not particular to the plaintiff is nonetheless sufficiently substantial to serve as the predicate for a constitutional deprivation. The first, which is discussed above, occurs where the plaintiff is a member of an identifiable group of prisoners, such as transsexuals, which is frequently singled out for attack. Westmoreland alleges no such circumstance. The second, and the one pertinent to this case, is where the risk of serious harm can be said to be substantial even though the precise victim or assailant are not ascertainable. The specific example provided by the Court is where "rape was so common and uncontrolled that some potential victims dared not sleep [but] instead … would leave their beds and spend the night clinging to the bars nearest the guard station." *Id.*[9]

Taken together these decisions circumscribe a spectrum within which a prison assault might constitute unconstitutional "punishment." At the most obvious end of the spectrum is the known risk to the particular plaintiff at the hands of a particular assailant. At the other end is knowledge of a risk so

pervasive that it affects all inmates. In both instances, the risk of assault—whether particularized or general—is substantial and may be actionable.

Westmoreland's complaint does not assert that any defendant knew of a particular risk of harm to him individually. Consequently, the decisions involving allegations of particularized risk are of no help to Westmoreland. Instead, Westmoreland argues that historic and pervasive overcrowding and understaffing in the City Jail resulted in a pervasive risk of grave physical harm, injury and death that, in turn, resulted in the October 20 assault. In so doing, Westmoreland alleges a generalized risk to which every inmate incarcerated at the City Jail is subjected.

■ The allegations of the complaint define the risk of harm to which Westmoreland was exposed: (i) the City Jail, which was designed to hold 729 inmates, was overcrowded and housed as many as 1355 inmates in 1992; (ii) the City Jail was understaffed as evidenced by the fact that "[a]t times in 1992, only one correctional officer supervised as many as 300 inmates"; and (iii) there were between 42 and 78 reported assaults in the City Jail in each month from January through April of 1992.[10] According to the complaint, the total number of assaults per month were: 2.5 per day (January); 1.5 per day (February); 1.6 per day (March); and 1.4 per day (April), respectively.

■ These allegations do not suggest the existence, much less knowledge, of a substantial risk of guard initiated assaults. However, they do allege a risk of inmate-on-inmate assault of which, for purposes of this motion, the defendants are presumed to have been aware. At the hearing on the motion to dismiss, Westmoreland's counsel urged the court to consider Westmoreland's claim as it would any other claim in which one inmate assaults another. However, even if the court

---

9. In *Ruefly v. Landon,* 825 F.2d 792 (4th Cir. 1987), the Fourth Circuit dismissed, under Fed. R.Civ.P. 12(b)(6), a complaint which failed to allege that the assailant was known to have presented a specific risk to the particular plaintiff. The decision in *Farmer* vitiates the decision in *Ruefly.*

10. According to the complaint, there were 78, 42, 51 and 42 assaults at the City Jail in January, February, March and April 1992, respectively. The complaint also alleges that the maximum jail population was 1000 in 1988, 1989 and 1990 and 1135 in 1991.

regards the assault on Westmoreland as an instance of inmate-on-inmate violence (notwithstanding that it was conceived and orchestrated by a guard), the risk alleged in the complaint cannot rise to the level of a substantial risk the knowledge of which constitutes "deliberate indifference" and hence punishment in the constitutional sense.

The fact that there were as many as 2.5 reported assaults per day in January does not permit a conclusion that each of the more than 1300 inmates was subjected to constitutionally prohibited substantial risk of harm solely by virtue of his incarceration in the City Jail. This is especially true where, as here, the complaint alleges a downward trend in the number of assaults and does not allege that those which did occur were serious or life threatening.[11] Because the risk of harm alleged by Westmoreland does not rise to the level of substantial risk of harm that constitutes the predicate for punishment within the meaning of the Fourteenth Amendment, neither the City nor the Sheriff is liable under a theory of "deliberate indifference" for the reprehensible conduct of Brown or its consequences to Westmoreland.

### 2. Causal Nexus

■ Westmoreland's complaint falls short in another crucial respect as well. To successfully assert a claim of punishment without due process under the Fourteenth Amendment, an inmate must assert not only that the defendants were deliberately indifferent to the substantial risk of harm posed by overcrowding, but also that this deliberate indifference *caused* a physical or emotional injury.

■ The reason for the causal nexus requirement is that there is a difference between a "condition" and a "punishment." The Fourth Circuit recently expounded this difference in the Eighth Amendment context, holding that a necessary component of an Eighth Amendment challenge to prison conditions is:

a serious or significant physical or emotional injury resulting from the challenged conditions. The Eighth Amendment does not prohibit cruel and unusual *prison conditions;* it prohibits cruel and unusual *punishments.* If a prisoner has not suffered serious or significant physical or mental injury *as a result* of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Eighth Amendment.

*Strickler v. Waters,* 989 F.2d 1375 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993) (emphasis added). This decision is useful in the Fourteenth Amendment context for its instruction that a particular condition constitutes punishment only where it *causes* physical or mental injury.

■ To prevail against the City, Westmoreland must plead and prove that the City had a policy or custom of deliberate indifference to the risks of overcrowding and understaffing and that this policy caused his injury. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature *caused* a constitutional tort." *Monell v. Department of Social Serv. of the City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (emphasis added). Liability under Section 1983 "arises only when city or county officials themselves, through an act establishing a policy or custom, *cause* the constitutional violation." *Gordon v. Kidd,* 971 F.2d 1087, 1097 (4th Cir. 1992) (emphasis added). "A government may be held liable under section 1983 only when execution of its policy or custom *inflicts* the injury." *Morgan v. District of Columbia,* 824 F.2d 1049, 1058 (D.C.Cir.1987) (emphasis added). Similarly, Westmoreland must allege and prove that Sheriff Winston's deliberate indifference caused his injury.

■ On the face of the complaint, it is clear that any conceivable causal nexus be-

---

11. The allegations describing the October 20 assault also undercut Westmoreland's conclusory allegation that he was subjected to a pervasive risk of serious harm on the night of the assault. For example, when inmate Miller "asked West-

moreland to accompany him to the rear of the cell block," (Motion for Judgment, ¶ 26), Westmoreland complied, apparently freely and without any threat or coercion. (Motion for Judgment, ¶ 27).

tween the risk to Westmoreland's safety allegedly presented by overcrowding at the City Jail and the October 20 assault on Westmoreland is "far too attenuated to permit a recovery here." *Best v. Essex County, New Jersey Hall of Records*, 986 F.2d 54 (3rd Cir.1993). True, Westmoreland alleges that a causal nexus may exist between a policy that permits overcrowding and an inmate-on-inmate assault, (Plaintiff's Mem. in Opposition to City's Motion to Dismiss, p. 7) (citing *Morgan v. District of Columbia*, 824 F.2d 1049 (D.C.Cir.1987)). This does not mean, however, that a causal nexus can exist between such a policy and an assault carried out at the request of a guard for personal reasons, especially when the court considers and takes as true, as it must, the factual allegations made in Westmoreland's complaint.

Nothing in the complaint suggests that overcrowding is a "but for" cause of the particular attack in this case. The complaint, for example, does not allege that "but for" overcrowding Deputy Brown would not have been able to scheme against him and seen that scheme to fruition.[12] Moreover, where a guard betrays his duty to protect the inmates under his charge and instead orchestrates a particular violent attack on one inmate, that attack could occur in a facility with ideal capacity and supervision because the mechanism in place to protect that inmate has been undermined. Westmoreland's complaint offers nothing beyond conclusory legal assertions that such a causal nexus exists in this case. This is legally insufficient to save his complaint in perspective of the complaint's other allegations demonstrating the absence of cause.

Nor is this a case where it is alleged that known tensions between prisoners caused by overcrowding and inadequate supervision directly resulted in an explosion of violence between prisoners in which Westmoreland was injured. At oral argument, Westmoreland's counsel candidly and commendably acknowledged that no such nexus was known to exist. Counsel acknowledged that the complaint attempted to expand existing law to cover only the specific allegations of the complaint.[13]

Because Westmoreland's complaint fails to state a claim of liability on the basis of deliberate indifference, the motions to dismiss filed by the City and the Sheriff must be granted as to that theory of liability.[14]

## B. Liability of Winston Based Upon Strict Liability for Actions of Deputy

In Count VII, Westmoreland argues that Winston is "strictly liable for the conduct of Deputy Brown taken under color of law, state authority, statute, custom or usage, and pursuant to official authority," (Motion for Judgment, ¶ 88), under an ancient state law doctrine holding a sheriff strictly liable for the acts of his deputies taken "colore officii." From this, Westmoreland argues that Sheriff Winston is liable for the attack against him, both under Section 1983 and under state law of assault and battery. For the reasons set forth below, this theory lacks merit and thus Count VII must be dismissed.

Both the Fourth Circuit and the Eastern District of Virginia have held that a sheriff may not be held vicariously liable under Section 1983 for the acts of his subordinates. *Strickler v. Waters*, 989 F.2d 1375, 1387 (4th Cir.1993) (sheriff sued pursuant to Section 1983 "cannot be held vicariously liable for any conduct of his subordinates"); *Revene v. Charles County Comm'rs*, 882 F.2d 870, 874 (4th Cir.1989) (allegation of inadequate training was only basis on which to hold sheriff liable "because no claim is made that he was directly involved in Revene's death and there is no vicarious liability under § 1983"); *Fish-*

---

**12.** He does not allege, for example, that "but for" overcrowding he would not have been incarcerated with his assailants, or that "but for" overcrowding Deputy Brown would not have acted as he did.

**13.** Counsel, of course, is obligated by law to make that acknowledgement and is to be complimented for satisfying that duty.

**14.** Because the court reaches this conclusion, the court need not consider the extent to which either the City or the Sheriff is responsible for conditions in the City Jail.

er v. Washington Metro. Area Transit Authority, 690 F.2d 1133, 1142 (1982) ("sheriff cannot be held liable vicariously under § 1983 for any conduct of his subordinates"); McDonald v. Dunning, 760 F.Supp. 1156 (E.D.Va.1991) (sheriff cannot be held personally liable for constitutional torts of subordinates in which he is not directly involved, and cannot be held officially liable unless deprivation occurred pursuant to official policy or custom or insufficient training).

Westmoreland relies on Scott v. Vandiver, 476 F.2d 238 (4th Cir.1973), in which the Fourth Circuit decided that a South Carolina law holding sheriffs strictly liable for the acts of their deputies could be the basis of liability under Section 1983. Significantly, the Fourth Circuit decided Scott in 1973 before it rejected vicarious liability as a basis for imposing liability on a sheriff under Section 1983 in Strickler, Revene and Fisher. The significant change that occurred between Scott and those decisions was the Supreme Court's decision in Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) wherein the Supreme Court closely examined the language and legislative history of Section 1983, holding that:

a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Id. at 694, 98 S.Ct. at 2037–38. In reaching this conclusion, the Court focused on the language of Section 1983 creating liability for "any person who, under color of any law, statute, ordinance, regulation, custom or usage of any state shall subject or cause to be subjected any person" to a constitutional deprivation. Id. at 691, 98 S.Ct. at 2036 (emphasis added). From this language the Court concluded:

that language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor. Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B caused A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent.

Id. at 692, 98 S.Ct. at 2036 (emphasis added).

Westmoreland argues that Monell and its progeny do not affect the viability of Scott. A similar argument was considered and rejected in the thoughtful decision in McDonald v. Dunning, 760 F.Supp. 1156, 1169–1170 (E.D.Va.1991) wherein Judge Ellis held that a sheriff is not vicariously liable under Section 1983 for acts of subordinates. Judge Ellis concluded that Scott's holding to the contrary was vitiated by Monell, by subsequent Fourth Circuit decisions rejecting vicarious liability in Section 1983 actions, and by decisions of other jurisdictions criticizing and rejecting the result of Scott. Id. The rationale of McDonald satisfactorily explains why the court must reject Westmoreland's invitation to apply Scott here.

■ Westmoreland has sued Sheriff Winston in both his official and individual capacities. Count VII clearly fails as to Winston in his official capacity. Although there is some uncertainty whether it is the City or the state that is responsible for the Sheriff's official acts in this situation, that issue is not outcome determinative here. The state cannot be liable because state officials sued in their official capacities are not "persons" under Section 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1958). The City cannot be liable because, under Monell, a municipality may not be held vicariously liable under Section 1983 for an injury inflicted solely by its employees or agents, but rather only when the government's policy or custom inflicts the injury. Monell, 436 U.S. at 694, 98 S.Ct. at 2037. As to Winston's liability in an individual capacity, when Monell is taken together with subsequent decisions of the Fourth Circuit and Eastern District of Virginia, it is clear that Winston may be held liable under Section 1983 only if he directly caused the constitutional deprivation. The court has already considered and rejected this argument in Count VI.

Moreover, it appears that the strict liability doctrine on which Westmoreland relies does not make Sheriff Winston strictly liable for Deputy Brown's actions in this case in any event. Westmoreland relies on three state decisions for the proposition that a sheriff is strictly liable for his deputy's conduct as if it were his own. *See Mosby's Adm'r v. Mosby's Adm'r*, 50 Va. 584, 603 (1853) (acts and defaults of a deputy, *colore officii*, are considered in law the acts and defaults of sheriff); *Moore's Adm'r v. Dawney*, 13 Va. 127, 132 (1808) (law looks upon sheriff and deputy as one person); *James v. M'Cubbin*, 6 Va. 273, 274 (1800) (sheriff shall answer civilly for all acts of his deputy).

■ Under this doctrine, a sheriff is strictly liable for the acts of his deputy taken *colore officii*. *Mosby*, 50 Va. at 603 ("acts and defaults of the deputy, colore officii, are considered in law as the acts and defaults of the sheriff"); *M'Cubbin*, 6 Va. at 274 ("the deputy acted as deputy"). Acts taken *colore officii* are an "[o]fficer's acts unauthorized by his position, though *done in form that purports that acts are done by official duty and by virtue of office*." Black's Law Dictionary 241 (5th Ed.1979) (emphasis added). In each of the cases applying the strict liability doctrine urged here by Westmoreland, the deputy was acting under the *purported and apparent authority of his office*. *See Mosby*, 50 Va. at 605–06 (deputy took possession of another person's property under an order to execute an estate and disposed of it in an unauthorized manner); *Moore*, 13 Va. at 127 (deputy took one man's property under an execution against another); *M'Cubbin*, 6 Va. at 273–75 (deputy rode one man's horse onto the land of another in order to levy a distress warrant on the property).

Specific language in the strict liability decisions also supports the reading that the deputy must act under the pretense of the authority of his office to create strict liability. *See M'Cubbin* at 273–75 ("the deputy acted as deputy"); *Garrett v. Hutchison*, 86 Va. 872, 11 S.E. 406, 406 (1890) (deputy's actions were "under the pretended authority" of the law and "under pretense of lawful authority").

■ Westmoreland does not allege that Brown purported to have lawful authority to arrange an attack on Westmoreland, nor could the prisoners with whom Brown conspired have perceived such lawful authority. For personal reasons, Brown "asked" an inmate to arrange the attack. The complaint does not assert otherwise. Because Brown's conduct was not taken under color of office, within the meaning of *Mosby, M'Cubbin* and *Moore*, Sheriff Winston is not strictly liable for his actions.

Westmoreland's pleading seems to concede that Sheriff Winston is not liable for *all* acts of his deputy, seeking instead to hold Winston accountable only for Brown's conduct "taken under color of law." [15] This approach, of course, necessarily substitutes the "under color of law" concept for the "under color of office" standard on which the strict liability cases are based. Westmoreland then points to contemporary decisions holding that an official acts "under color of law" when he misuses a power possessed by virtue of state law and his act is made possible because he is clothed in the authority of state law. *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988); *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941). On this premise, Westmoreland argues that Brown was able to conspire with inmates to arrange the as-

**15.** Despite this position, Westmoreland uses more sweeping language elsewhere in his brief. Westmoreland's discussion of this point in his brief is headed *"Sheriff Winston Is Strictly Liable For The Conduct Of Deputy Brown Taken Under Color Of Law"* (Plaintiff's Mem. in Opposition to Winston's Motion to Dismiss, p. 3). Westmoreland states "under the law of Virginia, a deputy and the sheriff are one and the same; there is no distinction." (Plaintiff's Mem. in Opposition to Winston's Motion to Dismiss, p. 6). The court recognizes that some of the cited cases use similarly broad language, although they do so in the context of decisions that do not broadly apply the legal doctrine at issue. If this language is read literally, a sheriff would be strictly liable for all acts by his deputy in any context, ranging from an off duty bar room brawl while off duty to domestic violence or child abuse in the home. No serious argument can be made, nor does Westmoreland make one, that the Sheriff is liable for any act of his deputy as he would be for his own. The only serious question is when a deputy can be said to have acted under color of office.

sault only by virtue of his position as a guard. This, says Westmoreland, is action "under color of law" sufficient to invoke the strict liability doctrine in state law. (Plaintiff's Mem. in Opposition to Winston's Motion to Dismiss, pp. 6–8).

However, Westmoreland cites no authority that would permit substitution of the modern standard of "under color of law" for the standard actually articulated and applied in the 19th-century strict liability cases on which he relies. That standard is that the deputy must have acted under color of office, *e.g.* a deputy acting as a deputy, under the pretense of lawful authority. Westmoreland's leap to the "under color of law" standard finds no support in the facts of the decisions on which he relies. In none of those decisions was a sheriff held strictly liable for the intentional tort of a deputy committed without any pretense of authority and outside the performance of his duties as a deputy. To so hold would make sheriffs strictly liable for any misconduct of a deputy that occurred within the four walls of the jail. There is no support in *Moore, M'Cubbin* or *Mosby* for that result.

## CONCLUSION

For the foregoing reasons, the motions to dismiss of the City and Sheriff Winston are granted without prejudice to the assertion in state court of any surviving state claims. The action, of course, may proceed against Brown. To that end, *counsel for plaintiff* shall advise not later than March 27, 1995 whether the action will proceed against Brown and, if so, the Clerk shall set the action for an initial pretrial conference.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record and to the guardian ad litem for Wendell H. Brown.

It is so ORDERED.