Guillermina CORTES–QUINONES,
Plaintiff, Appellee,

v.

Charles JIMENEZ–NETTLESHIP, etc.,
et al., Defendants, Appellants.

Nos. 86–2027, 86–2106.

United States Court of Appeals,
First Circuit.

Heard Nov. 3, 1987.

Decided March 28, 1988.

Rehearing and Rehearing En Banc Denied
April 22, 1988.

Vannessa Ramirez, Asst. Sol. Gen., Dept. of Justice, with whom Rafael Ortiz Carrion, Sol. Gen., and Norma Cotti Cruz, Deputy Sol. Gen., were on brief for defendants, appellants.

José E. Fernandez–Sein with whom Law Offices of Nachman & Fernandez–Sein, was on brief for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

On September 30, 1981, Puerto Rico prison officials transferred William Arenas Cortes, a psychiatrically disturbed prisoner, and thirty-nine other prisoners, from the State Penitentiary to the Arecibo District Jail, a jail so overcrowded that space per prisoner amounted to 15.5 square feet (*e.g.,* 30 by 74 *inches*). Within a matter of a few months, Arenas was found dead, his body dismembered. His mother brought this civil rights action, 42 U.S.C. § 1983 (1982), against three prison officials, claiming that their actions amounted to "cruel and unusual" punishment of her son in violation of the Eighth Amendment. After various preliminary proceedings, *see Quinones v. Nettleship,* 773 F.2d 10 (1st Cir. 1985), a jury returned a verdict in her favor in the sum of $247,000. The court awarded her attorneys $82,000 in fees and costs. The three defendants appeal these awards. In respect to the main issues that concern liability, we find no legal error. Other, subsidiary aspects of the case, however, will require further proceedings.

## I.

The basic legal standards governing this case are well established. "[P]rison officials have a duty under the 8th and 14th amendments to protect prisoners from violence at the hands of other prisoners." *Leonardo v. Moran,* 611 F.2d 397, 398–99 (1st Cir.1979); *accord Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984); *Zatler v. Wainwright,* 802 F.2d 397, 400 (11th Cir.1986); *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984); *Gates v. Collier,* 501 F.2d 1291, 1309 (5th Cir.1974); *Woodhous v. Virginia,* 487 F.2d 889, 890 (4th Cir.1973). Those amendments also impose a duty to attend to prisoners' "serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *accord Layne v. Vinzant,* 657 F.2d 468, 474 (1st Cir.1981); *Westlake v. Lucas,* 537 F.2d 857, 860 & n. 5 (6th Cir.1976); *Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.1974). When prison officials intentionally place prisoners in dangerous surroundings, when they intentionally ignore prisoners' serious medical needs, or when they are "deliberately indifferent" either to prisoners' health or safety, they violate the Constitution. *See, e.g., Layne, supra.* Different courts have described "deliberate indifference" in various ways, but, at least, that term encompasses acts or omissions so dangerous (in respect to health or safety) that a defendant's "knowledge of [a large] ... risk can be inferred." *Duckworth v. Franzen,* 780 F.2d 645, 652 (7th Cir.1985); *compare Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (inaction amounts to "deliberate indifference" if it constitutes " 'wanton infliction of pain' " (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976))) *with Martin,* 742 F.2d at 474 (equating "deliberate indifference" with "reckless disregard") *and Layne,* 657 F.2d at 474 (same). The first legal question before us is whether the record evidence is sufficient to permit a jury to find "deliberate indifference."

Defendants concede that conditions in Puerto Rico prisons in 1980–82 were appallingly bad, with severe overcrowding (a system-wide average of twenty square feet per prisoner), squalor, maltreatment, gang warfare, killings, lack of proper medical care, failure to segregate mentally disturbed prisoners, guards unable to control entire cellblocks, and other horrors catalogued in a federal district court order that found the entire system in violation of

the Eighth Amendment and ordered sweeping and dramatic changes. *Morales Feliciano v. Romero Barcelo*, 497 F.Supp. 14 (D.P.R.1979). Defendants add, however, that they were doing their best to cope with a near impossible situation, and that plaintiff should concede (and we agree) that their decision in September 1981 to transfer 40 prisoners from the State Penitentiary to Arecibo was reasonable in light of the fact that rioting State Penitentiary prisoners had broken through a concrete prison wall, forcing officials to close a section of that prison. Defendants Torres and Nettleship also point out that they had been in office only a few months by September 1981. Where, they ask, is the evidence that each of them, as individuals, was "deliberately indifferent" to Arenas' health or safety problems, except perhaps in respect to matters beyond their control? *See Pinto v. Nettleship*, 737 F.2d 130, 132 (1st Cir.1984) (no § 1983 liability for actions beyond a defendant's control).

■ Our review of the record convinces us that, even if we accept much of what defendants say, the jury still could find facts sufficient to warrant its finding of "deliberate indifference." Those facts consist of the following:

1. Arenas suffered from serious psychiatric problems. He had been diagnosed in the 1960s as a "childhood schizophrenic." In 1975, a psychiatrist wrote that "this inmate is suffering from chronic schizophrenia undifferentiated." An April 1975 prison system memo stated that Arenas needed "treatment with a psychiatrist or a psychologist." In June 1975, a prison psychologist wrote that Arenas showed "evidence of psychopathic tendencies, with possible conditions of schizophrenia" and that he warranted "psychotherapy treatment." The jury reasonably could have believed that this (or like) information was (or most certainly should have been) in Arenas's prison files.

2. Defendant Torres is Puerto Rico's Director of Penal Institutions, with special responsibility for prison security. Defendant Nettleship is Puerto Rico's Corrections Administrator. On the night of the prison-

er transfers, Nettleship and Torres were at the State Penitentiary. Torres read all 40 prisoners' files and decided on the transfer. Nettleship reviewed that decision and approved the transfer order. The jury thus could have found that they knew or certainly should have known of Arenas's psychological problems.

3. Defendant Candelaria was the Superintendent of the Arecibo District Jail. On the night of the transfer, he was at the prison and screened each of the transferees for medical and psychological problems. Although he conceded that he was not trained to conduct psychiatric evaluations, he testified that "when one looks at a person one can appreciate whether or not that person needs immediate treatment." Because the transfer was under emergency conditions, the prisoners' records did not follow until five days after the transfer. When they did arrive, Candelaria, who was chairman of the treatment and classification committee, did not review them. Instead, he sent the socio-penal records to the two social penal workers and sent the medical records to the medical staff for evaluation (an evaluation not yet made at the time of Arenas's death).

4. After being shown Arenas's psychiatric records for the first time at trial, the prison doctor testified that Arenas should never have been in the general prison population. Defendants should have segregated Arenas from those prisoners without mental problems. *See Morales Feliciano*, 497 F.Supp. at 37–40 (ordering that prison officials segregate and provide treatment for all "psychotics" and "severely mentally ill" inmates).

5. Arenas was not segregated. Instead, he was placed with 245 other inmates in a jail that, at the 35 square feet per prisoner minimum established by the *Morales–Feliciano* order, 497 F.Supp. at 38–39, could house only 109. (The Joint Committee for Accreditation, whose standards serve as a guide for the federal Bureau of Prisons, requires 60 square feet per single or double celled prisoner, and 75 square feet per dormitory prisoner.) Psychiatric treatment was nonexistent at Are-

cibo, and conditions were chaotic and violent, with the transferees, predominately members of the "Manuel Perez" prison gang, vowing to take over the jail from members of the rival Monacillo gang and to kill those who stood in their way. Arenas remained in that jail, unsegregated and without treatment for his psychological problems, for nearly four months until he was killed. During that time, Arenas's case never came before the prison classification and treatment committee, although Candelaria testified that it would have come up in "due time."

6. Had any of the defendants acted to segregate Arenas from mentally sound prisoners at Arecibo jail, he is unlikely to have been killed.

We believe that, given these facts, the jury could have found defendant Torres "deliberately indifferent" to Arenas's health and safety. The trial judge instructed the jury that "aggravated conditions" coupled with an official's failure to act could constitute "deliberate ... indifference in the sense that the official had knowledge or should have known of a pervasive risk of harm to inmates." *See, e.g., Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.1980) (prison officials liable for injuries to inmate where there was a " 'pervasive risk of harm to inmates from other prisoners' " and officials failed to respond reasonably to that risk (quoting *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir.1973)). The judge further instructed the jury that, in determining whether this standard had been met, it could consider "whether the system of classifying inmates was adequate or inadequate, whether *mentally sick inmates were exposed to risks in the general population of a jail*, whether there existed a known history of attacks and murders, ... and whether there was a serious breakdown of authority and control." (Emphasis added.) Torres knew of the terrible health and security problems at Arecibo. The jury could have inferred that he knew that sending a severely disturbed inmate to Arecibo, along with the others, invited especially serious trouble, including violence and death. For one thing, the prison doctor testified, without contra-

diction, that such a prisoner should have been segregated. For another, common sense suggests that including schizophrenics or possible psychopaths, along with others, in a dormitory where each prisoner has space equivalent to 30 by 74 *inches* (15.5 square feet) is a recipe for an explosion, which, given the other known conditions, could easily lead to someone's death. And, the circumstances of Arenas's death are consistent with his mental problems playing an incendiary role. Further, all three defendants were under court order to segregate "severely" mentally ill prisoners and to provide them with treatment, *Morales Feliciano*, 497 F.Supp. at 37–40, and the jury could have found from the psychiatric evaluations and the prison doctor's testimony that Arenas's mental illness was "severe" and that Torres knew (or should have known) this. He read the files the night of the transfer. He had the power to order more careful readings, more complete records (if psychiatric records were somehow missing), more thorough examinations, and, ultimately, to insist upon segregations. He did none of this. The risks of these "omissions" could have seemed to the jury serious enough and obvious enough to warrant a finding of "deliberate indifference."

The jury could have found "deliberate indifference" on the part of defendant Nettleship in the same way. He was present the night of the transfer. The jury might have believed he read the files himself, or, if not, that he was fully aware of how they were being used. He was aware (from the court decree in *Morales Feliciano*) of the need to segregate and provide treatment for severely mentally ill prisoners and of the risks involved in failing to do so. Yet, he neither ordered segregation nor provided for a system that would achieve that result, and he approved Arenas's transfer to a jail that he, in all likelihood, knew provided no in-house mental health treatment.

As to Candelaria, the jury could have found that he had shown deliberate indifference to Arenas's mental health needs, a fact that in turn foreseeably increased sig-

nificantly the risk of death. They could have found that, as superintendent and chairman of the treatment and classification committee, he should have arranged for the speedy transfer of the prisoners' files and a determination, within a few days of the transfer, of which prisoners needed to be segregated and provided psychological treatment. Of course, Candelaria might not have had the authority to hire psychiatrists or to order treatment; he did have authority to read files, to assure their completeness, and to order segregation. Further, Candelaria, like the other defendants, was under court order to have every inmate screened by trained mental health staff. *Morales Feliciano*, 497 F.Supp. at 37–40. The only screening Arenas received was the preliminary one Candelaria conducted on the night of the transfer, apparently without any effort to determine whether the files then present contained psychiatric information showing a need for segregation. In light of *Morales Feliciano*'s specific reference to the constitutional inadequacy of having untrained prison staff conduct psychological evaluations, *id.* at 18, the jury might also have found Candelaria's reliance on his own layman's screening effort the night of the transfer sufficient to constitute "deliberate indifference."

The plaintiff argues that defendants were "deliberately indifferent" to the health and safety risks at Arecibo in other ways as well, but these suffice to uphold the verdict.

## II.

■ The appellants argue that they enjoy a "qualified immunity" from paying damages in this case. They "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The relevant question "is the objective (albeit fact-specific) question whether a reasonable ... [official] could have believed" the omissions here at issue to have been "lawful in light of clearly established law and the information" they then possessed. *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). The defendants point to the fact that many of the cases holding officials liable for roughly comparable behavior are recent— post–1981—and that, judged as of the standards in force in 1981, their conduct was "objectively legally reasonable." *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739.

Application of the "legally reasonable" standard is for the court, not the jury. In this instance, the court held that defendants were not entitled to qualified immunity. And we believe it was correct for the following reasons. First, as of mid–1981, it was well established that "deliberate indifference" to a prisoner's health and safety violated the Eighth Amendment. *See, e.g., Estelle, supra; Layne v. Vinzant*, 657 F.2d 468 (1st Cir.1981). In *Leonardo v. Moran*, we wrote that "prison officials have a duty under the 8th and 14th amendments to protect prisoners from violence at the hands of other prisoners." 611 F.2d 397, 398–99 (1st Cir.1979). In *Layne*, we held that when "a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, 'administrative negligence can rise to the level of deliberate indifference.'" 657 F.2d at 471 (quoting *West v. Rowe*, 448 F.Supp. 58, 60 (N.D.Ill.1978)). We doubt that there is any significant difference between the "actual notice" of which *Layne* speaks, and the notice that prison conditions and the district court decree gave defendants in respect to the need to read the files or to have in place some procedures that would screen psychologically disturbed prisoners such as Arenas.

Second, as just mentioned, the defendants knew of the federal court decree finding the entire prison system unconstitutionally unsafe and medically deficient. The decree spelled out the need to determine which patients were severely mentally ill and to segregate them and ensure them adequate treatment. The district court orders, several paragraphs of which emphasized the need for such segregation, had been in effect since 1979. Even if the

defendants *thought* they did not violate the decree in so far as compliance involved matters beyond their control (*e.g.,* hiring more staff, obtaining increased appropriations), we do not see how they could have believed it lawful to violate the decree (in form or substance) in respect to matters that were *within* their control (*e.g.,* reading the files more carefully, making certain that past psychiatric records were in the files, reviewing them within a few days of transfer, providing segregated facilities for severely mentally ill inmates at Arecibo or a psychiatric hospital, or making certain that administrative systems were in place that achieved these ends).

Third, it is important to keep in mind that the word "unsafe" is inadequate to describe the *degree* to which Puerto Rico's prison system violated constitutional standards in 1981. To be specific, in 1981, 51 prisoners were killed by other inmates in Puerto Rico prisons out of a total prison population of approximately 4,000. By way of contrast, in the same time period in all the prison systems that responded to a survey conducted by the newsletter *Corrections Compendium,* (including 41 states and the federal system), out of a combined prison population of 263,000, 88 were murdered by other inmates. *See* 7 *Corrections Compendium* 1, 5–6 (March 1983); Bureau of Justice Statistics, U.S. Dept. of Justice, *Prisoners in State and Federal Institutions* (1982). Thus a prisoner in Puerto Rico in 1981 was approximately 40 times more likely to be murdered than a prisoner in the other penal institutions in the United States. Prison officials, working in these circumstances, understand that they are *not* liable for much of the harm that the system causes *only* because much of that harm involves matters beyond their individual control—appropriations decisions, for example, are in the hands of the legislature. *Pinto, supra.* Yet that fact, in the context of an unconstitutionally dangerous system, should make reasonable officials increasingly sensitive to the need to avoid those acts or omissions, *within* their control, that might make matters worse.

In our view, at least the combination of these factors is sufficient to deny defendants qualified immunity under current legal standards, *see Anderson, supra,* and we therefore need not decide when, or whether, a jury finding of "deliberate indifference" is, in and of itself, inconsistent with qualified immunity. *Cf. Albers v. Whitley,* 743 F.2d 1372, 1376 (9th Cir.1984) ("a finding of deliberate indifference is inconsistent with a finding of good faith or qualified immunity"), *rev'd on other grounds,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

Of course, one might argue that, in the context of a seriously deficient prison system like this one, courts should be unusually reluctant to deny "qualified immunity" to officials who are actually working for constructive change, lest damage suits and the decisions of judges and juries, less knowledgeable about actual conditions, inadvertently interfere with conscientious efforts to achieve reform. In our view, however, if anything, the opposite is the case. The government of Puerto Rico has paid for defendants' litigation and may well pay the damage judgment in a case like this. P.R.Laws Ann. tit. 32, §§ 3085–86 (1983). This indemnification by the state has the effect of transferring some of the human cost of the system, borne in the form of death and misery, to the public treasury, and thereby, perhaps, making the public more aware of those costs, and encouraging change. Regardless, we can find no reason for departing from strict application of legal standards here. Those standards, given defendants' knowledge of a seriously deficient system, a court decree, prior law, and the facts described in Part I that allow a finding of "deliberate indifference," do not permit the assertion of a "qualified immunity" defense.

### III.

■ Appellants argue that the district court erred in permitting the jury to consider the district court's decree in *Morales Feliciano.* To be more specific, the court instructed the jury as follows:

The question is then, what is deliberate conduct, inaction or indifference in a case like the one you have been hearing for the last four days? I can only give you factors for you to consider so that you are assisted in your findings in this case.....

The first factor that I think you should consider is that in the year 1979 this Court, in the case of Feliciano Morales versus Romero Barcelo found comprehensively that the entire prison system violated the Eight Amendment being overcrowded to the point that adequate supervision of inmates was very difficult.

The judge then read relevant excerpts from that opinion to the jury.

Since appellants did not object to the instruction at trial, we review it only to see if it amounted to "plain error." *See* Fed.R. Civ.P. 51; *Coy v. Simpson Marine Safety Equipment,* 787 F.2d 19, 25–26 (1st Cir. 1986). It did not. The decree was relevant in respect to liability, for reasons previously pointed out. It indicated what defendants might be expected to have known about the system and indicated the degree of importance they might be expected reasonably to have attached to the need to segregate mentally ill prisoners. At the same time, the court made clear that the jury should consider whether defendants were in office too short a time to have been expected to address the decree's concerns. The district judge made clear that violation of the decree was not a *sufficient* basis for holding defendants liable. And he stressed (again without objection) that defendants were liable only for "deliberate and reckless disregard for life so as to make it deliberate conduct or inadequate regard or disregard to the safety of the prisoners." Given these added instructions, we can find no plain error.

### IV.

■ We now turn to a subsidiary matter concerning damages. The plaintiff advanced two different claims against these defendants. She sued them (1) in the name of her son, whose claims for injury and death she inherited, and (2) in her own

right for loss of familial association. The jury awarded her $247,000 without distinguishing between the two claims or indicating which damages belonged to which claim. Subsequently, in a different case, this court of appeals held that a parent cannot maintain a claim for loss of familial association under 42 U.S.C. § 1983 unless the government action in question is directly aimed at the relationship between a parent and young child. *Valdivieso Ortiz v. Burgos,* 807 F.2d 6 (1st Cir.1986). All parties concede that the decision in *Valdivieso* would require a new trial in respect to damages. The appellee argues, however, that we should apply the ruling in *Valdivieso* prospectively; that is to say, we should not apply it to the jury award here, which took place before the *Valdivieso* ruling.

We must, however, apply the law in effect when we hear the case, namely, *Valdivieso,* "unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *see Simpson v. Director, Office of Workers' Compensation Programs, United States Department of Labor,* 681 F.2d 81, 84–85 (1st Cir.1982) (retroactive application of judicial decisions "is the rule, not the exception"); *see also Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed. 2d 296 (1971) (listing factors court should consider in weighing prospective application). Here there is no statute or legislative history at issue. Nor is there "manifest injustice." *Valdivieso* did not represent a change in the law of this circuit. Although some other circuits had found a cause of action somewhat similar to the personal claim plaintiff sought to assert here, *Kelson v. City of Springfield,* 767 F.2d 651 (9th Cir.1985); *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984) (recognizing parental right; rejecting right of sibling); *Trujillo v. Board of County Commissioners of the County of Santa Fe,* 768 F.2d 1186 (10th Cir.1985) (recognizing right but only if alleged deprivation is intentional), this circuit had not done so;

nor had it decided cases that suggested *Valdivieso* might have come out the other way. Indeed, perhaps recognizing this fact, the parties in this case originally arranged to ask the jury to separate damages when it gave its verdict. Fed.R.Civ.P. 49. But, for some reason, perhaps a slip-up, this was not done. Moreover, the "hardship" at issue here is a new trial, but only in respect to damages, and where (if the parties cannot settle the matter) the Commonwealth will likely have to pay the attorneys' fees of both sides. 42 U.S.C. § 1983 (1982). Were this sufficient to show "manifest injustice," the "prospective application" exception would swallow up the rule.

### V.

 Finally, appellants claim that the attorneys' fees awarded plaintiff's counsel are too high. They state that the $200 per hour used by the court to calculate the senior counsel's fee exceeds the rates previously allowed in this circuit. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945 (1st Cir.1984). And they say that to increase the fee by 50 percent to reflect the risk of loss was not legally justified. In respect to the latter claim, the law is clear that an upward adjustment of fees to reflect risk is proper only in "exceptional" cases, *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984), and when the court makes such an upward adjustment, it must, "at a minimum set forth in some detail the factors underlying its decision," *Conservation Law Foundation v. Secretary of Interior,* 790 F.2d 965, 970 (1st Cir.1986); *see also Blum,* 465 U.S. at 901, 104 S.Ct. at 1550 (rejecting upward adjustment where district court failed to adequately justify its decision), answering questions such as the following:

1. what, if any, payment each attorney would have received had the suit not been successful;

2. what, if any, costs or expenses each attorney would have incurred if the case had been lost;

3. whether, after the successful verdict, [counsel] were completely dependent upon the court for their fees;

4. the length of time and number of hours the case consumed during which [counsel were] required to compensate [their] associates and carry [their] overhead expenses without assurance of compensation; and

5. whether other attorneys refused to take the case because of a risk of nonpayment.

*Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 614 (1st Cir.1985).

The district court here gave no explanation of its 50 percent upward adjustment, or of its decision to award an hourly rate that exceeds significantly those we have previously viewed as "top" awards. Our precedents require explanations of both. Consequently, the district court must re-examine its attorneys' fees determination.

*The judgment of the district court is affirmed in respect to liability but vacated in respect to damages and attorneys' fees and the case is remanded for further proceedings consistent with this opinion.*