USCA1 Opinion

 

 United States Court of Appeals For the First Circuit
No. 98-1770 SHAWN GIROUX, Plaintiff, Appellant, v. SOMERSET COUNTY, FRED HARTLEY, and BARRY DELONG, Defendants, Appellees. APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] Before Selya, Circuit Judge, Gibson, Senior Circuit Judge,* and Lipez, Circuit Judge. Michael J. Schmidt, with whom Peter T. Marchesi was on
brief for appellant. Edward R. Benjamin, with whom Michael R. Bosse was on
brief for appellees.
May 24, 1999 *Of the Eighth Circuit, sitting by designation. LIPEZ, Circuit Judge. Shawn Giroux, a former inmate at
the Somerset County Jail, brought suit pursuant to 42 U.S.C. 1983
against one prison employee (Sergeant Hartley), Somerset County
Sheriff Barry DeLong, and Somerset County after he was assaulted by
another inmate. Giroux alleges a violation of the Eighth Amendment
prohibition of "cruel and unusual punishments" and pendent state
claims pursuant to the Maine Tort Claims Act, Me. Rev. Stat. Ann.
tit. 14, 8101 et seq. The district court granted a summary
judgment to all defendants on the 1983 claims and dismissed the
state law claims without prejudice. We reverse the judgment of the
district court. I. A. Facts We present the facts from the summary judgment record in
the light most favorable to Giroux, the non-moving party, and draw
all reasonable inferences in his favor. See Maldonado-Denis v.
Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). Giroux was
incarcerated in the Somerset County Jail in September 1995. On
September 19, 1995, Deputy Doug Manson informed Giroux that a
detective from the Somerset County Sheriff's Department wanted to
speak with Giroux. Manson escorted Giroux from his cell to meet
with the detective. Robert Tucker, an inmate with whom Giroux
shared a common day room, threatened Giroux in the presence of
Manson upon hearing that Giroux was going to meet with the
detective. Robert Tucker apparently thought that Giroux was going
to be asked for information about Tucker. After meeting with the
detective, Giroux was escorted to a new cell; his belongings had
been collected and moved for him. Although no reason for Giroux's
September 19th cell change is reflected in the jail's records, it
is a fair inference that Giroux was relocated in response to Robert
Tucker's threats. The next day, September 20, 1995, Robert Tucker again
threatened Giroux as he was taken past Robert Tucker's cell on his
way to breakfast. While at breakfast, Scott Tucker, Robert
Tucker's brother, sat down at a table with Giroux and communicated
a veiled threat to Giroux and two other inmates, Tony St. Pierre
and Wayne Curtis, telling them that they were lucky that his
brother Robert Tucker was "on the other side of the glass" or "on
the opposite side of the window" (referring to the fact that they
were separated from Robert Tucker during breakfast). Following
breakfast on September 20th, Scott Tucker and other inmates who
Giroux believed were in association with Robert and Scott Tucker
passed by Giroux's cell and threatened Giroux, telling him "you're
dead." Later that day Giroux and fellow inmates St. Pierre and
Curtis met with Jail Administrator Judith Thornton and, according
to Giroux, requested protective custody due to the Tucker brothers'
threats. Although Thornton testified in her deposition that she
has no recollection of such a meeting, jail records indicate that
Giroux was placed on cell feed status on September 20, 1995, and
Giroux is listed in jail records as being on cell feed status again
on September 21, 1995. There is no policy in the record governing
the use of cell feed status to protect inmates. Nevertheless,
every employee deposed testified to the practice of using cell
feeding as a protective device. Indeed, according to that
testimony, the only reasons for an inmate to be placed on cell feed
status are (1) health related or (2) as a form of protective
custody from other inmates. Jail employees, including co-defendant
and shift supervisor Sergeant Fred Hartley, testified that the
inmate roster should have indicated the reason for Giroux's cell
feed status. Although no reason for cell feeding Giroux is
recorded in the jail's records, it is a fair inference that he was
being cell fed because of threats against him. Co-defendant Sergeant Fred Hartley was the shift
supervisor on the evening and night of September 21, 1995. Giroux
and eight or nine other inmates participated in the jail's
visitation period that evening. After Giroux had been in the
common visiting room for some time, Scott Tucker was brought into
the same visitation room. The record does not establish who
escorted Giroux and Scott Tucker into the visitation room. According to policy, all the prisoners are subjected to a strip
search after participating in visitation and before being returned
to their cells. The inmates wait for this search in a holding cell
in which they are under observation through a plexiglass window. No prison guards are physically present. After an argument began
between Scott Tucker and another inmate in the holding cell, the
other inmate was escorted out of the holding cell. Immediately
thereafter, Scott Tucker began an argument with Giroux, and they
exchanged words. Scott Tucker then physically assaulted Giroux,
causing a broken nose, torn shoulder ligaments, and a head
laceration which required stitches to close. Because Hartley was
close by, distributing medication to other inmates, he was the
first person to break up the fight between Scott Tucker and Giroux. Additional facts will be referenced when relevant to the
discussion.
B. Procedural History In a complaint filed on September 8, 1997 alleging
violations of 42 U.S.C. 1983 and the Maine Tort Claims Act, Me.
Rev. Stat. Ann. tit. 14, 8101 et seq., Giroux claimed that
Sergeant Fred Hartley, Somerset County Sheriff Barry DeLong, both
of whom were sued in their individual and official capacities, and
Somerset County had deprived him of his right to be free of cruel
and unusual punishment in contravention of the Eighth Amendment to
the United States Constitution. Specifically, Giroux claimed that
the defendants had violated his right to be protected against
attacks by other inmates. The district court, adopting the findings and conclusions
of the magistrate judge, held that the evidence that Sergeant
Hartley had violated Giroux's Eighth Amendment rights was
insufficient and granted all defendants a summary judgment on the 1983 claims. Although acknowledging a fair inference that
Sergeant Hartley knew that Giroux was on cell feed status, the
court noted that the Eighth Amendment requires an actual,
subjective appreciation of a risk of harm in order to hold prison
officials liable under the Cruel and Unusual Punishments Clause of
the Eighth Amendment, and that Giroux had "presented no facts that
Hartley knew of the threats to [Giroux's] life, or that those
threats were made by an inmate who was in the holding cell with
[Giroux]." Turning to Giroux's claims against the Sheriff and the
County, and construing those claims as alleging a failure to train
Sergeant Hartley, the court stated that it was "satisfied that
Defendant Hartley did not violate [Giroux's] Eighth Amendment
rights," and therefore concluded that "no liability can attach to
Somerset County or Defendant [Sheriff] DeLong for failing to
properly train or supervise [Hartley]." The court then dismissed
the state law claims without prejudice. Giroux now appeals those
decisions. II.
A. The Cruel and Unusual Punishments Clause of the Eighth Amendment The Eighth Amendment prohibits "cruel and unusual
punishments," and "it is now settled that 'the treatment a prisoner
receives in prison and the conditions under which he is confined
are subject to scrutiny under the Eighth Amendment.'" Farmer v.
Brennan, 511 U.S. 825, 832 (1994) (quoting Helling v. McKinney, 509
U.S. 25, 31 (1993)). Prison officials have a duty to "provide
humane conditions of confinement; prison officials must ensure that
inmates receive adequate food, clothing, shelter, and medical care,
and must 'take reasonable measures to guarantee the safety of the
inmates.'" Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27
(1984)). That duty has its origins in the forced dependency of
inmates: "Having incarcerated persons with demonstrated
proclivities for antisocial criminal, and often violent, conduct,
having stripped them of virtually every means of self-protection
and foreclosed their access to outside aid, the government and its
officials are not free to let the state of nature take its course." Id. at 833 (internal quotations and brackets omitted). Therefore,
under the Eighth Amendment, "prison officials have a duty . . . to
protect prisoners from violence at the hands of other prisoners." Id. (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556,
558 (1st Cir. 1988)). However, not every injury suffered by a prisoner at the
hands of a fellow inmate gives rise to an Eighth Amendment claim. In order for a prison-conditions complaint to state a violation of
the Eighth Amendment, two requirements must be met. First, the
alleged deprivation of adequate conditions must be objectively
serious, i.e., "the inmate must show that he is incarcerated under
conditions posing a substantial risk of serious harm." Id. at 834. Second, the official involved must have had "a sufficiently
culpable state of mind," Wilson v. Seiter, 501 U.S. 294, 299
(1991), described as "deliberate indifference" to inmate health or
safety. Farmer, 511 U.S. at 834. In this context, "deliberate
indifference" means that "a prison official cannot be found liable
under the Eighth Amendment for denying an inmate humane conditions
of confinement unless the official knows of and disregards an
excessive risk to inmate health or safety." Id. at 837. This
standard, requiring an actual, subjective appreciation of risk, has
been likened to the standard for determining criminal recklessness. See id. at 839-40 (holding that "subjective recklessness as used in
the criminal law is a familiar and workable standard that is
consistent with the Cruel and Unusual Punishments Clause as
interpreted in our cases, and we adopt it as the test for
'deliberate indifference' under the Eighth Amendment"); see also id. at 837-38 (citing to Model Penal Code 2.02(2)(c) and noting
that criminal recklessness requires a person to "consciously
disregar[d] a substantial risk of serious harm"). While the
Supreme Court has admonished the lower courts to "be careful to
ensure that the requirement of subjective culpability is not lost,"
id. at 843 n.8, [w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.
Id. 842 (internal citation omitted). Even if prison officials know
of a substantial risk to inmate health or safety but fail to
prevent the harm, they "may be found free from liability if they
respond reasonably to the risk." Id. at 844. With these standards
in mind, we turn to the claim against Sergeant Hartley.
B. Sergeant Hartley In assessing the claim against Sergeant Hartley, we must
determine whether a reasonable juror, on the basis of the summary
judgment record, could conclude that Hartley "kn[ew] that [Giroux]
face[d] a substantial risk of serious harm and disregard[ed] that
risk by failing to take reasonable measures to abate it." Farmer,
511 U.S. at 847. Consistent with the magistrate judge's
recommendation, the district court assumed that a substantial risk
of serious harm had been shown but concluded that there was
insufficient evidence to support an inference of Hartley's actual
knowledge of the risk, and granted a summary judgement. We
disagree with the court's analysis of the summary judgment record. 1. Knowledge of a Substantial Risk of Serious Harm According to Hartley's own testimony, cell feed status
indicated either that the prisoner had a health problem or that the
prisoner was in protective custody. Hartley also testified that
one of his responsibilities as shift supervisor was to review the
cell block assignment roster each day at the start of his shift. A juror could reasonably conclude, therefore, that Hartley
performed this obligatory administrative task on September 21,
1995, thus alerting him at the very least to the fact that Giroux
was on cell feed status, and that one of the two explanations for
that cell feed status involved the risk that Giroux could be harmed
by another inmate. As Farmer instructs, Hartley did not have to know the
identity of the particular person threatening Giroux in order to
have actual knowledge of the risk. See Farmer, 511 U.S. at 843
("[A] prison official [may not] escape liability for deliberate
indifference by showing that, while he was aware of an obvious,
substantial risk to inmate safety, he did not know that the
complainant was especially likely to be assaulted by the specific
prisoner who eventually committed the assault."). If Hartley
understood that there was a high probability of a danger to Giroux,
he would not escape liability if the evidence showed that he merely . . . declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation . . .").
Id. at 843 n.8. In our view, the summary judgment record supports
the inference that Hartley was aware of a high probability that
Giroux was vulnerable to attack from another inmate but took no
action despite that awareness. 2. Deliberate Indifference to the Known Risk The next inquiry, then, is whether Hartley's inaction in
the face of the known risk evinced the culpability required for an
Eighth Amendment violation. Prison officials "who actually knew of
a substantial risk to inmate health or safety may be found free
from liability if they responded reasonably to the risk, even if
the harm ultimately was not averted." Id. at 844. The record
discloses no circumstances that constrained Hartley from responding
reasonably to protect Giroux: no time pressure, no lack of
resources, no competing concerns whatsoever. See, e.g., id. at 835
(distinguishing claims alleging excessive use of force by prison
guards because in that context the alleged actions of prison
officials are generally taken "in haste, under pressure, and
frequently without the luxury of a second chance") (quoting Hudson
v. McMillian, 503 U.S. 1, 6 (1992)). Hartley acknowledged that he
was obliged to find out the reason for cell feed status when the
cell block assignment roster did not contain that information, but
he claimed that this information was for his own edification and
that he had no responsibility, as shift supervisor, to disseminate
that information to the subordinates on his shift. Other prison
employees, including two subordinates who were working the night
Giroux was attacked by Tucker, testified that it was the
responsibility of the shift supervisor to tell them about any
inmates who were being cell fed for protective purposes when such
protective purposes were not listed on the inmate roster. On this record, therefore, there is a genuine and
material factual dispute about the scope of Hartley's
responsibility as shift supervisor. In resolving that dispute, a
reasonable juror could find that it was Hartley's responsibility as
shift supervisor to confirm the basis for the cell feeding of each
inmate in cell feed status and to alert the employees on his shift
to that basis, in order to reasonably protect the inmates in his
custody. A juror could find that Hartley's abdication of his
responsibility, in the face of such a known danger to Giroux's
safety, was a reckless dereliction of duty rising to the level of
Eighth Amendment deliberate indifference. "When a supervisory
official is placed on actual notice of a prisoner's need for
physical protection or medical care, administrative negligence can
rise to the level of deliberate indifference to or reckless
disregard for a prisoner's safety." Rondon-Pinto v. Jimenez-
Nettleship, 737 F.2d 130, 132 (1st Cir. 1984) (discussing
deliberate indifference in the context of supervisory liability
under 1983) (internal quotations omitted). The court erred in
ruling that the summary judgment record could not support a finding
that Hartley was deliberately indifferent to Giroux's safety.
C. Sheriff DeLong and Somerset County Having found for Hartley on the defendants' motion for
summary judgment, the district court summarily concluded that the
Sheriff and the County could not be liable for deficient policies
or for a failure to train. Because the district court premised its
grant of summary judgment for the Sheriff and the County on
Hartley's exoneration, that determination, too, must be vacated and
the plaintiff's claims against all three defendants reinstated for
further proceedings. Judgment vacated. The case is remanded to the district
court for further proceedings consistent with this opinion. Costs
to appellant.