**Gayle BLANKENSHIP, Personal Representative of Carrington Blankenship, Plaintiff,**

v.

**Commonwealth of VIRGINIA, et. al., Defendants.**

**No. CIV.A. 305CV584HEH.**

United States District Court, E.D. Virginia, Richmond Division.

May 11, 2006.

■■■■■■■■■■■■■■■■

_____

## MEMORANDUM OPINION

HUDSON, District Judge.

### (Granting Defendants' Motion for Summary Judgment)

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment. All parties have filed memoranda of law stating their respective positions.[1] The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and argument would not aid the decisional process.

This tragic and disturbing case involves the brutal beating of C. Blankenship ("Blankenship"), at the hands of two fellow wards of the Beaumont Juvenile Correction Center ("Beaumont"). Blankenship's mother, Gayle Blankenship ("Plaintiff"), brought this Civil Rights action pursuant to Title 42 U.S.C. Section 1983, as the personal representative of her son, against Defendants H. Lee Noble ("Noble"), the former Superintendent of Beaumont, Jack Scott ("Scott"), the former Assistant Superintendent of Operations for Beaumont, and Clifton Cooper ("Cooper"), a former Counselor for Beaumont.[2] Plaintiff claims that Defendants violated her son's Civil Rights by failing to protect him from his fellow wards.

Defendants filed the present Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

For the reasons stated below, Defendants' motion will be granted.

## I. Background

In 2001, Blankenship, a juvenile, was incarcerated at Beaumont in the custody of the Virginia Department of Juvenile Justice. In April of 2001, Blankenship advised Defendant Cooper, his counselor, that he was "not feeling safe in general population" and requested a transfer to another unit at the facility. (Pl.'s Ex. III at 1.) Based on this conversation, Cooper notified his superiors of the situation and Blankenship was subsequently scheduled to be moved to a new housing unit within the general population. *Id.* However, on the day that he was scheduled to be moved, Blankenship became involved, as the aggressor, in a physical altercation with another ward. *Id.* As a result of this incident, Blankenship was moved from the general population to "a more secure pod used for special management of wards" known as a "Behavioral Modification Pod" or an "isolation pod." (Def.'s Ex. VI at 1.) On May 21, 2001, Blankenship was brutally assaulted by two (2) fellow wards. As a direct result of this assault, Blankenship suffered severe head trauma and was permanently disabled.

On August 19, 2005, Plaintiff brought this civil action alleging that the defendants knew of the threat to Blankenship and deliberately ignored it in violation of Blankenship's rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.

On April 6, 2006, Defendants filed the present Motion for Summary Judgment

---

**1.** The Court notes that pursuant to Local Rule 7 Plaintiff's Response in Opposition was due within eleven (11) days of the date Defendant filed his Motion for Summary Judgment. Plaintiff chose to disregard the Court's rules by filing his Opposition on May 1, 2006, a full fourteen (14) days late.

**2.** Defendant Commonwealth of Virginia was dismissed as a party from this action on November 4, 2005, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

arguing that there is no genuine issue as to any material fact and that they are entitled to judgment in their favor as a matter of law.

## II. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the movant has met this burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Rule 56(e) requires the non-moving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment is proper if after viewing all the evidence, including supplemental affidavits, in the light most favorable to the non-moving party, the Court finds no genuine issue exists. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## III. Analysis

### A. Summary Judgment as to Defendants Noble and Scott

The United States Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones, ... 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811, (1994) (internal citations omitted). The Constitution's prohibition against cruel and unusual punishment imposes certain affirmative duties on prison officials including the duty to provide humane conditions of confinement and ensure that the prisoners in their custody receive adequate food, clothing, shelter, and medical care. *Id.* Prison officials must also take "'reasonable measures to guarantee the safety of the inmates.'" *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). In particular, "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir.1988).

However, not every assault suffered by an inmate at the hands of another inmate rises to the level of a constitutional violation. "Any time an individual is incarcerated, there is some risk that he may be a victim of violence at the hands of his fellow inmates ...." *Westmoreland v. Brown*, 883 F.Supp. 67, 74 (E.D.Va.1995). In cases in which an inmate has been assaulted by a fellow inmate, prison officials can only be held liable for a constitutional violation when the physical harm suffered by the inmate is the result of "deliberate or callous indifference of prison officials to specific known risks of such harm." *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir.1987).

The Supreme Court has advised that the deliberate indifference standard "describes

a state of mind more blameworthy than negligence." Rather, it must be shown that the official knew of and disregarded an excessive risk to inmates' health or safety. *Farmer*, 511 U.S. at 835–37, 114 S.Ct. 1970. The official must have been "aware of facts from which the inference could [have been] drawn that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference." *Id.* at 837, 114 S.Ct. 1970.

■ A plaintiff may prevail if he can present evidence that the prison official had actual knowledge of a substantial risk to an inmate and took no action despite the known risk, or "that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant—official being sued had been exposed to information concerning the risk and thus "must have known" about it ....'" *Id.* at 842, 114 S.Ct. 1970. As a result, "[t]he decisions finding that prison assaults constitute unconstitutional 'punishment' have most often done so upon finding one of three species of particularized harm." *Westmoreland*, 883 F.Supp. at 74.

In the first, the plaintiff has been at some particularized risk individually because of: (i) a personal trait; or (ii) membership in an identifiable class that is particularly vulnerable to harm. In the second place, the person who committed the assault has demonstrated an unusually violent nature of which the defendant knows and which makes the assailant a substantial risk to his fellow inmates. In the third, the defendants were aware that the specific assault was ongoing or had occurred, yet had failed to respond to protect, ... the victim.

*Id.*

■ In the case at bar, Defendants Noble and Scott submitted sworn affidavits indicating that prior to the assault they had no knowledge that Blankenship was in fear for his safety or that he requested to be moved to another location. Plaintiff admits that Noble and Scott had no actual knowledge of the threat, however, she suggests that because "the threats had been communicated to their agent and employee Cooper ... [they] had constructive knowledge of the threats" and can be held directly liable. (Pl.'s Resp. to Statement of Undisputed Facts ¶ g at 2.) This Court disagrees.

The United States Supreme Court in *Farmer v. Brennan*, 511 U.S. 825, 840–45, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), specifically rejected the argument that prison official liability can be based on constructive knowledge. The *Farmer* Court held that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847, 114 S.Ct. 1970. However, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838, 114 S.Ct. 1970. As a result, Plaintiff's theory of liability based on the constructive knowledge of Defendants Noble and Scott as to the threat against Blankenship must fail.

■ Plaintiff next asserts that liability can be assigned to Noble and Scott based on the fact that Beaumont had been decertified by the Virginia Board of Juvenile Justice. Plaintiff's theory is essentially that because Noble and Scott knew that Beaumont had been decertified in 1999, this fulfills the knowledge requirement of *Farmer* because it proves that Defendants

had knowledge of a "substantial risk of serious harm" to Blankenship by his fellow wards. *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970. To support this assertion, Plaintiff produced several Certification Audit Reports evaluating Beaumont for the Virginia Board of Juvenile Justice. Plaintiff specifically points to the Audit Report dated April 2000, which advises that "[d]ue to staff vacancies Beaumont does not have enough staff on the units to provide protection, guidance, and supervision to the extent needed." (Pl.'s Ex. D at 4.) Plaintiff asserts that these statements prove that Defendants "knowingly subjected juveniles who were housed at that facility to an unsafe environment." (Pl.'s Resp. in Opp. at 4.)

Plaintiff has submitted a total of seven (7) Audit Reports beginning in April 2000, and ending in May 2001, totaling some twenty-five (25) pages. A review of these reports indicates that the above-quoted language in the April 2000 Audit Report is the only language which indicates a concern for the safety of the inmates. Other than this brief passage, there is nothing in the reports to suggest a constitutionally impermissible risk of violence between the wards.

Contrary to Plaintiff's assertions, the fact that Beaumont was declassified in 1999, standing alone, does not necessarily confer on Defendants Noble and Scott "knowledge as to the ongoing and substantial risk of harm to residents." (Pl. Resp. in Opp. at 8.) The Audit Reports submitted by the plaintiff makes it clear that Beaumont was declassified for a host of reasons, including failure to maintain the facility's plumbing in good working order, insufficient space for beds, and failure to maintain required locks and mechanical devices. However, other than the language mentioned above, there is no evidence to suggest that the declassification was related in any way to a substantial risk of inmate attacks.

In fact, a review of the November 2000 Audit Report indicates that "[t]he most significant change since" the April 2000 Audit Report was "the replace[ment] of the Superintendent and the two (2) Assistant Superintendents." The November report also advises that "[s]trong evidence was demonstrated during this current audit that the new administration is making vast improvements, in operating procedure, staffing issues, and service delivery." (Pl.'s Ex. E at 2.) The report goes on to advise that "[r]esidents feel safer and appear to be benefitting more from the treatment programs being offered." *Id.* The Court also notes that based on these improvements Beaumont was recertified more then six (6) months prior to the assault on Blankenship in November 2000. (Pl.'s Ex. K at 21.)

The Court is of the opinion that the one sentence highlighted by Plaintiff concerning staffing issues, in an Audit Report dated more than six (6) months before the assault, does not rise to the level of persuasive evidence that a substantial risk of inmate attack was longstanding, pervasive or well-documented. This is especially true when one considers the fact that subsequent Audit Reports specifically indicate an overall improvement in the area of staffing and safety of the wards.

█ Plaintiff next argues that Defendants Noble and Scott had knowledge that Blankenship was at a significant risk of substantial harm because the February 2001 Audit Report indicates a "concern with regard to documentation in residents' files." (Pl.'s Resp. in Opp. at 5.) Specifically, Plaintiff points to the November 2000 Audit Report which advises that Beaumont had a problem with incomplete documentation which resulted in:

1. Beaumont personnel not being aware of the status of residents;

2. Residents and family members being denied possession and receipt of necessary information; and

3. Violations of the residents' emergency grievance procedures.

*Id.* at 6. Plaintiff suggests that "the repeated failure to document and report appropriately pursuant to the findings of the audit team, necessarily means that Defendants cannot address the concerns of the juvenile [sic] including safety concerns and that the failure to act between November 2000 and April 2001 represents a willful disregard for the safety of the plaintiff [sic]." *Id.*

Although this evidence may indicate a deficiency in Beaumont's record management capabilities, it in no way suggests a willful disregard for the safety of the wards, and it certainly does not rise to the level of "longstanding, pervasive, well-documented" evidence that the "official being sued had been exposed to information concerning the risk and thus must have known about it ...." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970.

▮ Plaintiff next argues that knowledge can be imputed to the defendants based on the fact that on February 6, 2001, a guard employed by Beaumont was assaulted by several wards. Regrettably, confrontations between prisoners and their keepers are all but unavoidable. The fact that an incident of this type took place does not suggest that Blankenship was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970.

▮ Lastly, Plaintiff submits her own affidavit in which she advises that during her first visit to Beaumont, she observed "that the inmates were much larger physically and appeared much older than the

residents at the facility where [Blankenship] had been transferred from." (Pl.Ex. B at 2.) Plaintiff also advised that during her visits with Blankenship, she "did not recall seeing a corrections officer in the room where visitation took place," despite the fact that the room contained approximately thirty (30) people. *Id.*

Although the Court is not unsympathetic to the tragedy that the plaintiff and her son endured, this Court cannot assign liability based on this type of speculative and anecdotal evidence.

▮ Finally, although Plaintiff fails to raise the issue, there is nothing in the record to suggest that Blankenship was at some particularized risk individually because of a personal trait or membership in an identifiable class that is particularly vulnerable to harm. Nor is there any evidence to suggest that the wards who assaulted Blankenship had demonstrated an unusually violent nature thus putting the defendants on notice of the threat they posed to other wards.

In sum, there is no evidence in the record to suggest that either Defendants Noble or Scott were aware of facts from which an inference could be drawn that Blankenship was in substantial risk of serious harm. Accordingly, Defendants' Motion for Summary Judgment as to both Noble and Scott will be granted.

**B. Summary Judgment as to Defendant Cooper**

▮ Unlike Defendants Noble and Scott, Defendant Cooper had direct knowledge that Blankenship feared for his safety. This knowledge stems from the fact that Blankenship personally advised Cooper one (1) month before the assault that he was feeling threatened by other wards in the general population and specifically requested to be moved. Plaintiff contends

that Cooper must be held liable for the assault because he "did not respond reasonably to the known risk to [Blankenship's] life." (Pl.'s Resp. in Opp. at 8.)

█ As the Supreme Court advised in *Farmer*, "prison officials who actually [know] of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if harm ultimately was not averted." 511 U.S. at 845, 114 S.Ct. 1970. In Defendant Cooper's affidavit, he averred that after being notified by Blankenship of his safety concerns, he notified his supervisor and scheduled Blankenship to be moved to a more secure pod. On May 2, 2001, Blankenship was in fact moved to a special housing unit known as an "isolation pod." (Def. Ex. VI at 1.) An isolation pod "is a more secure pod used for special management of wards, including protective custody . . . ." *Id.* at 2. After being placed in the isolation pod, Blankenship no longer complained to Cooper or expressed any fear that he was still in danger. In fact, before the assault, Blankenship specifically advised Cooper that he wished to remain in the isolation pod until his scheduled release.

Plaintiff suggests that it was "inherently unreasonable" to move Blankenship to the isolation pod because "it was 'designated Behavior Management [and was] designed to house the more aggressive, young men with a higher disciplinary problem or issues than the general population.'" (Pl. Resp. in Opp. at 8 (quoting Pl.Ex. K at 19.)) However, Plaintiff produces no evidence to support this argument. The fact that Beaumont chooses to house their most aggressive wards in the same pod does not necessitate the conclusion that this pod is inherently more dangerous than the general population. For example, a behavioral management pod houses twelve (12) wards as compared to the standard of twenty-four (24) wards per pod in the general population. Furthermore, wards assigned to an isolation pod are segregated from the general population and must remain in their pod. However, wards assigned to the general population are given much more freedom to move about the facility and interact with fellow wards. Due to the fewer number of wards and the greater restriction placed on their movements, one could just as easily infer that an isolation pod is in fact safer than the general population, despite the fact that it houses more aggressive individuals.

Accordingly, the evidence suggests that it was reasonable, based on the threat imposed to Blankenship by the wards in the general population, to move him to the more secure isolation pod. This is particularly true when one considers that Blankenship himself requested a transfer out of the general population, and more importantly, specifically requested to remain in the isolation pod until the date of his release.

Blankenship's transfer to the isolation pod can also be justified on grounds independent of those mentioned above; namely, Blankenship's own proclivity for violence. Plaintiff does not dispute the fact that prior to Blankenship's transfer, he was involved as the aggressor in an altercation with another ward in the general population. In determining the reasonableness of Cooper's actions, the Court must be cognizant of the fact that not only did Cooper have a legal duty to take reasonable steps to ensure the safety of Blankenship, but he also had an equally compelling duty to protect other wards from assault at the hands of Blankenship. Once it became clear that Blankenship had violent tendencies, it was entirely reasonable for Cooper to move him to the isolation pod in order to separate him from the general population and thus reduce the

risk that Blankenship would carry out future assaults.

 Although it is unfortunate that Blankenship was assaulted despite the best efforts of the defendants, "[t]he question under the Eight Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health ....' "[3] *Farmer*, 511 U.S. at 843, 114 S.Ct. 1970 (*quoting Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). This Court finds that based on the facts contained in the record, Defendant Cooper responded reasonably to ensure the safety of Blankenship and did not, as a matter of law and fact, expose him to a substantial risk of serious damage to his future health. Accordingly, Defendants' Motion for Summary Judgment as to Defendant Cooper will also be granted.

## IV. Conclusion

The plaintiff is neither able to identify any material facts genuinely in dispute in this case nor point to any probative evidence supporting her Complaint. Her claim therefore must fail as a matter of law. Accordingly, Defendants' Motion for Summary Judgment will be GRANTED.

An appropriate Order will accompany this Memorandum Opinion.

### *ORDER*

### (Granting Defendants' Motion for Summary Judgment)

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment. All parties have submitted memoranda of law in support of their respective positions. For the reasons stated in the accompanying Memorandum Opinion, Defendants' Motion for Summary Judgment is HEREBY GRANTED.

It is so ORDERED.

The Clerk is directed to send a copy of this Order to all counsel of record.

---

3. Because the Court finds as a matter of law that Defendant Cooper acted reasonably to the threat to Blankenship, it is not necessary for the Court to determine whether or not Blankenship's generalized statement indicating that he was "not feeling safe in general population" rises to the level of a significantly substantial risk to his safety.